**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 26 2000**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SHEBA M.J. MOHANKUMAR,

    Plaintiff - Appellant,

    v.

KANSAS STATE UNIVERSITY;
RONALD MARLER, individually;
JON D. DUNN, individually,

    Defendants - Appellees.

No. 99-3182
(D. Ct. No. 97-CV-1199)
(D. Kan.)

---

**ORDER AND JUDGMENT**[*]

---

Before **TACHA**, **HOLLOWAY**, and **BALDOCK**, Circuit Judges.

    Plaintiff Dr. Sheba MohanKumar appeals from the district court's grant of

summary judgment in favor of defendants Kansas State University ("the

University"), Dr. Ronald Marler, and Dr. Jon Dunn. We exercise jurisdiction

pursuant to 28 U.S.C. § 1291 and affirm.

---

[*]This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. This court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

I.

In April 1992, the University accepted plaintiff, a woman and Indian national, as a doctoral candidate in the Department of Anatomy and Physiology ("the Department") within the College of Veterinary Medicine ("the College"). Defendant Dunn was head of the Department, and defendant Marler was Dean of the College. Dunn offered plaintiff a graduate research assistantship with an $18,000 stipend for the 1992-1993 academic year. Plaintiff accepted Dunn's offer, thereby agreeing to teach one semester for each academic year of financial support she received.

Plaintiff began her doctoral studies in August 1992. In December 1992, the Department increased the annual stipend for a student with plaintiff's qualifications to $20,000. Accordingly, plaintiff received a $20,000 departmental stipend for the 1993-1994 academic year. She also received a stipend for the 1994-1995 academic year.

In May 1995, the Department limited the duration of stipends for Ph.D. candidates to four years. As a result, Dunn informed plaintiff that her stipend support would end on June 17, 1996. In April 1996, plaintiff requested a stipend extension until December 1996. Dunn responded that the Department would make every effort to fund her for an additional three months. Eventually, plaintiff met with Dunn and Marler. In the meeting, plaintiff indicated to Marler that

Dunn was harassing her because Dunn disliked her graduate advisor, Dr. Quadri. After the meeting, plaintiff received a stipend extension until she graduated in December 1996.

In June 1996, plaintiff submitted a late request for departmental travel support. She received only $350 even though the Department's written policy authorized $500. Around the same time, a Caucasian American student also submitted a late request for travel support and received only $350. Then, in July 1996, Dunn notified plaintiff and another graduate student who shared an office that they were being reassigned to a different location in order to accommodate a new faculty member. Ultimately, however, plaintiff remained in her office until she graduated.

In July 1996, plaintiff complained to the University's Associate Director of Affirmative Action that Dr. Dunn was discriminating against her on the basis of national origin and gender. In or about January 1997, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). She alleged that the University had attempted to limit her stipend support to four years due to her sex and national origin. She also claimed that Dunn tried to relocate her office in retaliation for her protests about the elimination of her stipend. The EEOC issued a dismissal and notice of right to sue.

Also in January 1997, Quadri, plaintiff's graduate advisor, requested that

Dunn waive a competitive recruitment process to fill an open post-doctoral position and instead hire plaintiff to fill it. Dunn did not participate in the decision to hire plaintiff, but he expressed his opinion that it would not be in either plaintiff's or the Department's best interest to hire her. In April 1997, plaintiff nevertheless was hired for the post-doctoral position without a competitive search.

On May 5, 1997, plaintiff filed case number 97-1199 in the district court based on her January 1997 EEOC complaint. On August 26, she filed a second EEOC complaint alleging national origin discrimination and retaliation. Plaintiff grounded this complaint in Dunn's refusal to recommend her for the post-doctoral position and the University's three-month delay in hiring her. The EEOC issued a dismissal and notice of right to sue in February 1998. On May 18, 1998, plaintiff filed case number 98-1174 in the district court.

In her consolidated suits, plaintiff claimed that defendants engaged in unlawful employment discrimination against her based on gender and national origin in violation of Title VII and 42 U.S.C. §§ 1981 and 1983. Defendants moved for summary judgment, and the district court granted their motion. Plaintiff filed this timely appeal.

## II.

We review the district court's grant of summary judgment de novo,

applying the same legal standard as the court below. <u>Bullington v. United Air Lines, Inc.</u>, 186 F.3d 1301, 1313 (10th Cir. 1999). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We examine the factual record and reasonable inferences therefrom in the light most favorable to the nonmoving party. <u>Bullington</u>, 186 F.3d at 1313.

A.

Plaintiff alleges the following violations of Title VII: (1) disparate treatment, (2) retaliation, and (3) hostile work environment.

1.

Plaintiff first claims that defendants subjected her to disparate treatment in violation of 42 U.S.C. § 2000e-2(a)(1). She contends that they treated her less favorably than two Caucasian American males in the Department, Blane Lowe and Lonnie Kilgore, when they attempted to limit her stipend support to four years. She also argues that the attempt to relocate her office and the three-month delay in hiring her as a post-doctoral fellow are evidence of disparate treatment.

To establish a prima facie case of disparate treatment, plaintiff must show that 1) she belongs to a protected class, 2) she suffered an adverse employment

- 5 -

action, and 3) defendants treated similarly situated employees differently. See Trujillo v. University of Colo. Health Sciences Ctr., 157 F.3d 1211, 1215 (10th Cir. 1998). Even assuming that graduate students in receipt of stipends qualify as employees for purposes of § 2000e-2(a)(1), we find no evidence in the record that plaintiff suffered an adverse employment action or that defendants treated her differently than similarly situated employees.

Plaintiff received $131,436 from the department over four and one-half years. Although her stipend support was scheduled to end in June 1996, she received an extension until December 1996. Plaintiff also received stipend support from the biochemistry department within the College of Arts and Sciences when she was a master's student from 1990-1992.

Lowe received $119,288 in stipend support from the Department over six years. He received two of his six years of support before Dunn became the Department head in 1990. In addition, Lowe started his graduate studies as a Ph.D. candidate, changed to a master's degree candidate, and then changed back to a Ph.D. candidate. Kilgore received $62,370 in stipend support from the Department over four years. Like plaintiff, he received support from another department before he began his Ph.D. studies.

Because plaintiff obtained a stipend extension to finish her degree and received more funding than either Lowe or Kilgore, she did not suffer an adverse

employment action. Furthermore, plaintiff and Lowe are not similarly situated since Dunn was head of the Department when plaintiff began her Ph.D. studies, and plaintiff remained a Ph.D. candidate throughout her four and one-half years in the Department.

Similarly, plaintiff did not suffer any adverse employment action as a result of defendants' attempt to relocate her office or the three-month delay in hiring her as a post-doctoral fellow. Plaintiff ultimately remained in her office until she finished her degree. In addition, she was hired to fill the post-doctoral position without a competitive search. Plaintiff offers no evidence that the three-month interval was in any way unusual or subjected her to different treatment than similarly situated employees.

We therefore conclude that plaintiff's disparate treatment claim under § 2000e-2(a)(1) fails as a matter of law.

## 2.

Plaintiff next claims that defendants unlawfully retaliated against her for filing a complaint with the University's Affirmative Action Office. To support this claim, she points to Dunn's opposition to her post-doctoral hiring and the University's three-month delay in hiring her.

42 U.S.C. § 2000e-3(a) prohibits retaliation against an employee for asserting a Title VII claim. To establish a prima facie case of unlawful

retaliation, plaintiff must show, inter alia, that she was subjected to an adverse employment action. <u>Sanchez v. Denver Pub. Sch.</u>, 164 F.3d 527, 533 (10th Cir. 1998). As we held above, plaintiff did not suffer any adverse employment action since the University did in fact hire her for the post-doctoral position without a competitive search, and there is no evidence that the three-month delay was in any way unusual. Thus, plaintiff's retaliation claim also fails.

3.

Finally, plaintiff claims that defendants' entire course of adverse conduct toward her created a racially hostile work environment in violation of 42 U.S.C. § 2000e-2(a)(1). To support her claim, she relies on (1) the attempt to limit her stipend support, (2) the award of only $350 in travel support, (3) the attempt to relocate her office, (4) Dunn's opposition to her post-doctoral hiring and the University's three-month delay in hiring her, (5) four complaints against Dr. Dunn between July 1996 and May 1998 by Department students alleging Indian national origin discrimination, and (6) disparaging comments Dunn made about her national origin.

Specifically, plaintiff testified at her deposition that Dunn made the following remarks to her:

> [W]hen [Dunn] was walking out with a donut in his hand he would call it a typical Indian breakfast, when he saw me

on the way, and if it snows outside he would say ["]typical Indian weather.["]  And when he saw me in the hallways walking with my husband he used to say that I had to walk two paces behind my husband because it was an Indian custom to do so.  And one day when I was having coffee in the break room he stopped by suddenly and he asked me in a derogatory fashion[,] "Do they make cars in India?"

Appellant's App. at 106.  Plaintiff further testified that Dunn made some of these comments several times over approximately a four-year period, but that they did not bother her much.

To survive summary judgment on her hostile environment claim, plaintiff "must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Penry v. Federal Home Loan Bank of Topeka, 155 F.3d 1257, 1261 (10th Cir. 1998), cert. denied, 526 U.S. 1039 (1999) (internal quotation marks and citation omitted).  Plaintiff must establish that the environment was both objectively and subjectively hostile.  Id.  In evaluating the challenged conduct, we must consider "all the circumstances[,] including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Trujillo, 157 F.3d at 1214 (internal quotation marks and citation omitted).

After considering the totality of the circumstances in this case, we hold that no rational jury could conclude that defendants' conduct was so severe or pervasive as to alter the conditions of plaintiff's employment and create an abusive working environment. There is no indication that defendants' conduct, including Dunn's comments, objectively interfered with plaintiff's work performance or was physically threatening or humiliating as opposed to being merely offensive. Furthermore, plaintiff admitted that Dunn's remarks did not subjectively bother her much. Thus, we find that plaintiff's hostile work environment claim is without merit.

B.

Plaintiff also claims that defendants' conduct violated 42 U.S.C. §§ 1981 and 1983. Section 1981(a) guarantees all people within the United States the same right to make and enforce contracts as is enjoyed by white citizens. Section 1983 affords a right of action against any person who, under color of state law, deprives an individual of any right secured by the Constitution and laws of the United States.

Plaintiff has offered no evidence that defendants treated her contractual rights differently than they treated those of her Caucasian counterparts. Her § 1981 claim therefore fails. As for the § 1983 claim, plaintiff cites no constitutional right which she believes that defendants violated. Because she thus

predicates her § 1983 claim solely upon her rights under Title VII and because we have found that defendants did not violate these rights, plaintiff's § 1983 claim also must fail.

AFFIRMED.

ENTERED FOR THE COURT,


Deanell Reece Tacha
Circuit Judge